IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION



FILED

SEP 7 2012

CLERK, US DISTRICT COURT
NORFOLK, VA

**DIANNE ELIZABETH FOREHAND,**

PLAINTIFF,

v.  CIVIL CASE NO. 4:11CV58

**MICHAEL J. ASTRUE, COMMISSIONER,**
Social Security Administration,

DEFENDANT.

## ORDER

This matter comes before the Court on Michael J. Astrue's ("Defendant" or "Commissioner") Objections to the Report and Recommendation of the Magistrate Judge. Doc. 24. For the reasons explained below, the Court **OVERRULES** Defendant's objections and **ADOPTS** the Magistrate Judge's Report & Recommendation ("Doc. 21" or "R&R").

### I. BACKGROUND

**A. Procedural History**

Defendant does not object to the recitation of the procedural and factual background of this case contained in the R&R, which sets forth, inter alia, the following facts. Diane Elizabeth Forehand ("Plaintiff" or "Forehand") is fifty-seven (57) years old and has not been engaged in substantial gainful activity since June 2, 2007, her alleged onset date of disability. R&R at 2. Forehand filed an application for disability insurance benefits on May 15, 2008 claiming that rheumatoid arthritis ("RA"), hypertension, and sleep apnea limited her ability to work. Id. Her application was denied on August 11, 2008, and denied again upon reconsideration on March 6,

2009. Id. She requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration ("SSA"), and one was held on March 4, 2010. Id. At the hearing, Forehand was represented by counsel and testified as to the severity of her impairments. Additionally, Ms. Edith Edwards, a vocational expert ("VE"), testified.

The ALJ issued a decision finding Forehand not disabled under the Social Security Act ("the Act") on April 13, 2010. Finally, Forehand's administrative remedies were exhausted when the Appeals Council denied her request for review on February 24, 2011. That denial made the ALJ's decision the final decision of the Commissioner subject to this Court's review pursuant to 42 U.S.C. § 405(g). See Wilkins v. Secretary, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991), superseded on other grounds, 20 C.F.R. § 404.1527.

**B. Forehand's Condition**

Though the record reflects a litany of other medical problems,[1] the ALJ found only two of Forehand's impairments, RA and obesity, to be severe. R. at 15. The parties focus their arguments on whether evidence concerning the limitations these two severe impairments imposed on Forehand's ability to work was properly considered. Because of this focus, the nature of these impairments will be discussed in greater detail.

*1. Laboratory and Clinical Evidence and Diagnoses*

At the time of her hearing before the ALJ, Forehand was 5'7" and weighed approximately 230 pounds. R. at 36, 536. She is seropositive[2] for RA with palindromic presentation beginning in 1991 according to her previous treating rheumatologist, Dr. Alexander

---

[1] Forehand has also been diagnosed with asthma, hyperactive airways disease, depression, esophagitis, irritable bowel syndrome, diabetes, hyperlipidemia, autoimmune liver disease, cervical disk disease, and allergies. R&R at 2 (citing Administrative Record ("R.") at 277–78, 323, 406, 408, 417, 469, 518–19).
[2] Laboratory tests of her blood work were positive for antibodies related to RA. R. at 336; See Dorland's Illustrated Medical Dictionary 1698 (Douglas M. Anderson et al., eds, 32nd ed. 2012) (defining seropositive).

Wilson. R. at 336. Lab reports show her Rheumatoid Factor[3] increased from 53 in 2002, to 81.5 in 2007, and to 93.8 in 2009 with the lab reports indicating a 0.0–13.9 "limit" for this test. R. at 230, 333, 395. In 2007, her Anti-CCP[4] level was a 100 with the lab report indicating that greater than five was "positive." Records from Dr. Wilson also reveal that she had swelling in her hands and arthritic nodules on her Achilles tendons upon examinations in 2007 and 2008. R. at 336, 341. Dr. William Massey, a Disability Determination Services ("DDS") medical consultant also found subcutaneous nodules on both of Forehand's elbows and heels in early 2009. R. at 370.

Moreover, Forehand was diagnosed with a specific variety of rheumatoid arthritis, palindromic. Dr. Massey concurred with this diagnosis of "palindromic arthritis," stating that it "ebbs and flows." R. at 372. Dr. Wallingford, Forehand's treating rheumatologist, also mentions "palindromic rheumatism" in the history section of his treatment notes. R. at 403. "Palindromic" is a medical term used to describe something as relapsing or recurring and appears to have special meaning when used in rheumatology. Dorland's Illustrated Medical Dictionary 1364, 1639 (Douglas M. Anderson et al., eds, 32nd ed. 2012). "Palindromic rheumatism," the term Dr. Wallingford used,

> has been applied to a recurring pattern of polyarthritis which <u>does not result in joint deformity</u>. It is a relatively uncommon disease . . . which may represent a variety of rheumatoid arthritis. That belief is fostered by the fact that almost a third of palindromic rheumatism patients eventually develop rheumatoid arthritis. It is characterized by intermittent joint pain with tenderness, heat and swelling that lasts from a few hours to as long as a week. Systemic symptoms are rare. The knees or fingers are most often involved, but the disease does not necessarily return to the same joints. <u>Between attacks there is no evidence of the disease.</u> Symptomatic treatment is usually sufficient, since remission occurs within hours or days.

7 Attorneys Medical Advisor § 68:50 (emphasis added). <u>See also</u>, Raimon Sanmarti et al., <u>Palindromic Rheumatism and Other Relapsing Arthritis</u>, 18 Best Practices & Research Clinical

---

[3] An indication of antibodies related to RA.
[4] Another indication of antibodies related to RA.

Rheumatology 647, 648–69 (2004) (discussing the same in more detail and describing how it can evolve to RA); H. G. Hardo, Palindromic Rheumatism: A Review, 74 Journal of the Royal Society of Medicine 521 (1981) (same); Dorland's Illustrated Medical Dictionary 1639 (Douglas M. Anderson et al., eds, 32nd ed. 2012) ("Palindromic Rheumatism a condition where there are repeated episodes of arthritis . . . without producing irreversible changes in the joints"); Arthritis Care UK, Palindromic Rheumatism Fact Sheet, http://www.arthritiscare.org.uk/Publicationsand Resources/Listedbytype/Factsheets/main_content/PalindromicfactsheetJune11.pdf (last updated June, 2011) (describing the same in laymen's terms and clarifying that it is also known as "palindromic arthritis" as Dr. Massey described it).

Forehand was prescribed Prednisone and Methotrexate for her RA in December, 2007. R. at 298. She was switched from Methotrexate to Enbrel in early 2008. R. at 293. Enbrel helped initially, but eventually had to be ceased because of her reactions to it and then she returned to Methotrexate. R. at 285–87, 293.

*2. Medical Opinions*

Dr. William Massey, an examining, but non-treating, DDS medical consultant, dictated a memo on March 2, 2009, concurring with a diagnosis of palindromic arthritis and stating a belief that Forehand was limited to clerical, administrative, sedentary type activity. R. at 372. He noted that she had been seeing Dr. Wilson, who Dr. Massey referred to as an "excellent rheumatologist," but that her insurance had run out. Id. He mentioned that Dr. Wilson had brought Forehand's symptoms under control through treatment, but that Forehand had to "stop the treatments because of the cost after she had lost her insurance." R. at 369.

Dr. Michael Cole, a non-examining DDS medical consultant, completed a Physical Residual Functional Capacity form on March 5, 2009. He stated that, on his review of the record,

he believed Forehand was capable of light work, pointing to findings of normal gait, station, and motor strength and noting that claimant reported no medications to Dr. Massey. Neither Drs. Cole nor Massey directly addressed the need for Forehand to alternate between sitting or standing or whether she would miss work unexpectedly due to her impairments.

Dr. Daniel Muench, Forehand's primary care physician, completed a "Multiple Impairment Questionnaire" on September 17, 2009, and composed a letter concerning Forehand on October 20, 2009. He stated that he believed Forehand was disabled as a result of her multiple impairments, including RA. R. at 502. He believed that she could only perform sedentary work. Id. In the questionnaire he indicated that Forehand would have "good days" and "bad days" and estimated that she would be absent from work as a result of her impairments or treatment more than three times per month.[5] R. at 475. He believed she was prone to infections because methotrexate suppresses her immune system. Id. He indicated Forehand had constant pain at a level of 8 out of 10 and that the pain was in her joints in her shoulders, elbows, hands, wrists, and knees. R. at 470–71. He also indicated that she would have to take unscheduled 15 minute breaks, but was unclear as to the frequency.[6] R. at 474.

Dr. Wallingford, Forehand's treating rheumatologist, completed a "Rheumatoid Arthritis Impairment Questionnaire" on September 17, 2009. He also indicated that Forehand would have "good days" and "bad days" and estimated that as a result she would be absent from work as a result of her impairments or treatment more than three times per month, but believed that she would have to take unscheduled 2-5 minutes breaks every 30-60 minutes. R. at 465, 467. He

---

[5] The options for "good days and bad days" were "yes" or "no" and, "if yes," the options for absences from work were "less than once a month," "about once a month," "about two to three times per month," or "more than three times per month."

[6] He indicated that she *must* get up every 2 hours on page 471 of the Administrative Record ("R."), but when asked how frequently unscheduled breaks would occur he wrote, "est Q 20" which appears to be a reference to a question where he indicated the impairment would last longer than a year. R. at 474.

5

indicated that Forehand had inflammation and limited movement in her neck, shoulders, knees, feet, fingers, and wrists. R. at 462–63. He rated her pain at a level 6 out of 10 and indicated that it was continuous, would frequently interfere with her ability to concentrate, and was reasonably consistent with her physical limitations. R. at 464, 466. He wrote that prolonged repetitive activity was related to Forehand's pain. R. at 464. He also mentioned the laboratory test results discussed above. R. at 463. With regard to exertional limitations he limited Forehand to occasionally lifting up to 20 pounds, but never more. R. at 466.

Dr. Givens, Forehand's treating pulmonologist, completed a "Pulmonary Impairment Questionnaire" on October 9, 2009. He also concurred that Forehand would have "good days" and "bad days" and estimated that as a result she would be absent from work as a result of her impairments or treatment more than three times per month, but indicated that she would have to take unscheduled breaks hourly for a variable duration. R. at 514. He diagnosed Forehand with Chronic Obstructive Pulmonary Disease and Chronic Restrictive Ventilatory Disease as a result of tests he ordered, which are in the record. R. at 509–11. He stated Forehand's symptoms of dyspnea, wheezing, and exhaustion were reasonably consistent with these impairments. R. at 511–12.

### 3. Forehand's Testimony

Forehand testified on March 4, 2010, that she quit working in 2007 because she was out sick too much from her "rheumatoid." R. at 37. The Methotrexate and Prednisone she was taking at the time did not give her relief Id. She had "migratory swellings" "in various joints on different days" that occurred "one to two times a week" with "intense, sharp, tendonitis-like, immobilizing pain" and lasted for "two or three days." R. at 38, 42–45. She had one unique incident where she put a lot of weight on her hand and felt the joint rupture. R. at 39. But what

her "rheumatoid does regularly . . . is cause intense swelling in the joints and surrounding tendons." When the swelling is in her shoulders, elbows, and hands she says she cannot grasp anything and drops things. R. at 42–45. When it is in her legs she says that she lies on the couch or the bed. Id. She said that she had "driven to Dr. Wilson's office for steroid injections . . . [but] the relief . . . didn't warrant the trip" so she did not go when she had a swelling anymore. She "asked Dr. Wallingford if he wanted to see a swelling, because Dr. Wilson did want to see them; and Dr. Wallingford said it wouldn't . . . help in his diagnosis, that [her] blood-work was sufficient." R. at 46. She stated that "she doesn't go to see Dr. Wallingford unless [she didn't] have a swelling." Id.

**4. The ALJ's Findings**

The point of contention is this case is the ALJ's consideration of medical opinions in arriving at Forehand's Residual Functional Capacity ("RFC"), which is defined as the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520. The ALJ found that Forehand

> has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: the claimant can lift up to 10 pounds occasionally, sit for 6 hours in an 8 hour workday and walk or stand for up to 2 hours in an 8 hour workday. The claimant can perform work activities that do not require more than occasional pushing or pulling of more than 10 pounds and tasks not requiring climbing or working around unprotected heights or dangerous machinery. The claimant can perform work activities that require gross use of her hands but no frequent grasping.

R. at 17. In doing so, the ALJ declined to adopt two additional limitations advocated by Forehand: first, that she would need to take unscheduled breaks to alternate between sitting and standing and, second, that she would be absent from work more than three times per month. R. at 19, 21. The ALJ considered all the medical opinions in this case, but found the opinions recommending these limitations to be inconsistent with examination notes showing "good

strength in [Forehand's] extremities and a normal gait and station" as well as "objectives findings."[7] R. at 19. The ALJ also gave "no significant weight" to Dr. Muench's statement that Forehand was disabled because it was a "finding . . . reserved to the Commissioner" and because it was inconsistent with Dr. Muench's contemporaneous statement that Forehand was capable of sedentary activity. Id.

The ALJ found Forehand's statements as to her disabling pain to be "partially credible to the extent they are inconsistent with the above residual functional capacity."[8] R. at 19. Although the ALJ's reasoning here is not clear from the record, it appears that what the ALJ meant is that because "[t]he objective findings from physical examinations and the conservative nature of the treatment the claimant ha[d] required [were] not consistent with [her] allegations of 'disabling' pain," he credited her testimony only insofar as to reach the "above residual functional capacity." R. at 18–19.

### 5. The Magistrate Judge's Report and Recommendation

The R&R found that the ALJ did not adequately consider the medical opinion evidence or Forehand's testimony. Accordingly, the R&R recommended remand so that the medical opinion evidence and testimony could be properly considered.

## II. STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, the Court reviews de novo any part of a Magistrate Judge's recommendation to which a party has properly objected. Fed. R. Civ. P. 72(b)(3). The Court may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Id.

---

[7] The ALJ was referencing findings at the beginning of his decision which mostly consist of brief summaries of some treatment notes showing mild symptoms upon examination.
[8] This is an odd statement by the ALJ since the ALJ is supposed to take the claimant's testimony into consideration before arriving at an RFC. See SSR 96-7p.

8

In exercising de novo review, the Court analyzes the Commissioner's final decision using the same standard as that used by the Magistrate Judge. Specifically, the Court's review of the Commissioner's decision is limited to determining whether that decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support a conclusion." Johnson, 434 F.3d at 653 (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)) (internal quotation mark omitted). Courts have further explained that substantial evidence is less than a preponderance of evidence, but more than a mere scintilla of evidence. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Importantly, in reviewing the ALJ's decision the Court does not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." Johnson, 434 F.3d at 653 (quoting Craig, 76 F.3d at 589) (internal quotation mark omitted) (second alteration in original). Thus, if the Court finds that there was substantial evidence to support the ALJ's factual findings, even if there was also evidence to support contrary findings, the ALJ's factual findings must be upheld.

### III. ANALYSIS

The dispute in this case hinges on the manner in which the ALJ weighed both Forehand's testimony and the opinions of her treating and examining physicians in light of objective evidence. Defendant presents two objections. First, Defendant contends that substantial evidence supported the ALJ's findings and that the R&R erroneously found fault with the ALJ's use of objective evidence to reduce the weight given to medical opinions. Second, Defendant claims that the R&R impermissibly re-weighed the evidence and placed undue emphasis on conclusory

checkbox forms. These two objections are merely different angles on the same complaint. The medical opinions that the R&R found to have been improperly disregarded were expressed on "checkbox" forms. Thus, both objections focus on whether the R&R correctly determined that the ALJ improperly considered and assessed the weight of medical opinions. As such, both objections will be considered together.

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow a five-step sequential evaluation of disability set forth in the Social Security regulations, which involve determining whether Forehand:

> (1) is engaged in a substantial gainful activity; (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment.

See 20 C.F.R. § 416.920. An affirmative answer to question one or a negative answer to question two or four requires a determination of no disability. Id. An affirmative answer to question three or five establishes disability. Id. If the claimant is not engaged in substantial gainful activity and is found to have one or more severe impairments that are not listed within the Social Security Administration's official listing of impairments, the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520.

In determining the claimant's RFC, the ALJ is required to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (quoting Johnson, 434 F.3d at 654). Courts usually "accord greater weight to the testimony of a

treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." Johnson, 434 F.3d at 654 (quoting Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001)). But "the ALJ holds [the] discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178. Such evidence can take the form of a lack of support from clinical evidence or inconsistency with other substantial evidence. Id. However, the ALJ must provide us with "an adequate explanation of that decision" to enable judicial review. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). Such an explanation should "build[] an accurate and logical bridge between the evidence and [his] conclusions." Young v. Astrue, 771 F. Supp. 2d 610, 619 (S.D. W. Va. 2011) (citing Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003)). Furthermore,

> [o]nce an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

Hines, 453 F.3d at 564–65 (quoting Social Security Ruling ("SSR") 90-1p, superseded by SSR 96-7p). Though, "[i]f an individual's statements about pain or other symptoms are not substantiated by the medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." SSR 96-7p. Additionally, complaints of pain or other symptoms need not be accepted by the ALJ "to the extent that they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that

11

impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Hines, 453 F.3d at 565 n.3 (quoting Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996)).

Here, whether the ALJ properly considered both Forehand's testimony and the opinions of her treating physicians in determining her RFC is contested. In determining Forehand's RFC, the ALJ declined to adopt two additional limitations advocated by Forehand: first, that she would have to take unscheduled breaks to alternate between sitting and standing and, second, that she would be absent from work three or more days a month. R. at 19, 21. The medical opinions of her treating physicians, Drs. Muench, Givens, and Wallingford, supported these limitations, but the ALJ either ignored them or afforded them little weight with scant reasoning. R. at 19.

The ALJ found that the medical evidence established rheumatoid arthritis and chronic joint pain, but he discounted both Forehand's testimony of disabling pain and the medical opinions regarding unscheduled breaks and absences.[9] R. at 15, 18–19. Specifically, the ALJ gave "minimal" weight to Drs. Wallingford and Given's opinions as to unscheduled breaks because they were "not supported by examination notes showing good strength in her extremities and a normal gait and station." R. at 19. The ALJ also gave "minimal weight" to Dr. Given's opinion on absences because it was "not consistent with the objective findings" or with the "conservative treatment" she has required. The ALJ did not discuss Drs. Wallingford or Muench's opinion on absences or Dr. Muench's opinions on breaks.[10] It was this short shrift

---

[9] The characterization of Forehand's treatment as "conservative" is a point of contention as she has been on and off of Enbrel, Methotrexate, and Prednisone at various times because of rashes or diarrhea in addition to receiving steroid injections, but ceasing them because "the relief wasn't worth the trip." All of this treatment was for her arthritis alone. R&R at 10.

[10] In fact, the ALJ failed entirely to consider the "Multiple Impairment Questionnaire" that Dr. Muench filled out, but instead only addressed the letter he sent. R. 19, 502. The R&R's consideration of how the ALJ addressed the letter is directly on point. See R&R at 23 n.11.

12

given to medical opinions of treating physicians that the R&R found to be unacceptable.[11] R&R at 20–26.

The ALJ either failed to consider relevant medical opinions or gave considered opinions "minimal" weight based on logically disconnected grounds and, therefore, the grounds cannot serve as a sufficient explanation for his decision. For instance, while the ALJ considered Dr. Given's opinion on absences and rejected it because Dr. Givens had controlled Forehand's breathing problems with treatment, the ALJ's failure to consider Forehand's primary care physician and rheumatologist's opinions on the same limitation is notable.[12] First, because her primary care physician, Dr. Meunch, would be in the best position to know how her conditions might cause absences. He had treated her for numerous ailments and referred her to other specialists for treatment. R&R at 2, 22 (citing R. at 277–79, 323, 406, 408, 417, 469, 518–19). This was not true of Dr. Givens. Additionally, Dr. Muench provided additional grounds for his opinion on absences in stating that Methotrexate suppressed her immune system. R. at 475. Second, because the treating rheumatologist, Dr. Wallingford, would be in the best position to determine how Forehand's palindromic rheumatoid arthritis, an impairment the ALJ found to be severe, would result in absences from "flare ups." This was also not true of Dr. Givens. Furthermore, the ALJ does not appear to have given any consideration at all to the unanimous

---

[11] The R&R, in a brief paragraph, also found that the ALJ failed to weigh Dr. Massey's opinion. The R&R cites a portion that is beneficial to Forehand, but seems to be Dr. Massey's recounting of his interview with Forehand and is not in the portion of his dictated letter entitled "Medical Source Statement," which seems to be where he expresses his opinions. R. at 368–72. The Medical Source Statement section is consistent with the ALJ's findings. The R&R correctly noted that the ALJ made some factual errors with regard to Dr. Massey's findings. The ALJ does seem to have failed to consider Dr. Massey's opinion, but we need not determine whether it is error sufficient to merit remand as remand is appropriate on other grounds discussed infra. On remand the ALJ should weigh Dr. Massey's opinion and correct the factual errors the R&R notes. R&R at 27 n.12.

[12] The R&R found the ALJ's consideration of Dr. Given's opinion to be incorrect because the ALJ found the opinion to be inconsistent with Dr. Wallingford's when in fact both opinions were the same as to absences. Defendant correctly points out that the ALJ found Dr. Givens opinions about the weight Forehand could lift and her absences to be inconsistent with Dr. Wallingford's opinion and objective evidence. Dr. Wallingford did state a different weight. As to the absence limitation being inconsistent with objective evidence, this is addressed infra.

agreement of Forehand's physicians as to the palindromic nature of her rheumatoid arthritis.[13] This oversight is apparent because the grounds the ALJ cited for discounting the opinion testimony on unscheduled breaks, Forehand's "conservative" treatment and objective evidence of her normal gait, station, and strength <u>upon examination</u>, are actually <u>consistent</u> with both her diagnosis of palindromic rheumatoid arthritis and her testimony that, once Dr. Wilson had seen her swellings and diagnosed her, she would only go out when her swelling had subsided. R. at 46. This incomplete and logically disconnected consideration is insufficient.

This case bears great similarity to <u>Hines</u>. In <u>Hines</u>, the Fourth Circuit dealt with subjective evidence of disabling pain by a claimant. The claimant had Sickle Cell Disease, a blood disorder that can be diagnosed by blood-work and causes great pain, but does not usually produce objective evidence of pain. <u>Hines</u>, 453 F.3d at 560–61. The court reiterated the standard for subjective pain and found that, by requiring objective evidence, the ALJ had "applied an improper legal standard to discredit the treating physician's opinion and refused to credit unrebutted testimony that the plaintiff could not work an eight hour day." <u>Hines</u>, 453 F.3d at 567.

District courts have distinguished <u>Hines</u> in RA cases, because, as the commissioner argues, RA is susceptible of objective proof, but these cases are inapposite because they did not address RA of the palindromic variety. <u>See, e.g.</u>, <u>Cannon v. Astrue</u>, No. 4:10-cv-177-fl, 2011 WL 6842990 at *4 (E.D.N.C.) (holding that the lack of objective evidence of traditional rheumatoid arthritis was sufficient to undermine claimant's testimony as to the intensity, persistency, and limiting effects of their pain); <u>Harris v. Astrue</u>, No. JKS-09-3396, 2011 WL 6837565 at *4–5 (D. Md.) (same); <u>Allen v. Astrue</u>, No. 3:08-cv-293, 2009 WL 866830 at *8 (E.D. Va.) (same and finding activities of daily living to rebut plaintiff's testimony). Forehand

---

[13] Both her rheumatologists and the examining DDS medical consultant concurred. R. at 333, 372, 403. The others did not go into detail about her arthritis.

14

does not have traditional rheumatoid arthritis but rather a palindromic variant of rheumatoid arthritis, which as discussed above, appears to have characteristics more similar to Sickle Cell Disease in that it can produce pain without substantial objective evidence of pain. Thus, the facts of this case more closely resemble Hines than they do those cases dealing with traditional rheumatoid arthritis. The ALJ found that Forehand had rheumatoid arthritis and obesity which were medically determined impairments that could reasonably be expected to result in the types of symptoms Forehand claims, but he stated that the record didn't support the degree alleged. R. at 17. However, his analysis of Forehand's testimony and the medical opinion evidence failed to consider the unique and unanimously diagnosed palindromic nature of her rheumatoid arthritis and how that variation could have produced the pain she claims with only some of the objective evidence traditional rheumatoid arthritis produces. This is a position the disregarded opinions of Drs. Muench and Wallingford support, both of which citing a mid-to-high pain level,[14] the need to change positions, and the likelihood of more than three absences a month. R. at 465, 467, 474–75.

The Commissioner also attacks the "conclusory checkbox forms"[15] that served as the medium for some of the medical opinions of Drs. Muench, Wallingford, and Givens. The Commissioner cites multiple cases for the assertion that the ALJ legitimately gave little weight to such forms. See Mason v. Shalala, 994 F.2d 1058, 1065 (3rd Cir. 1993); Frazier v. Sullivan, No. 90-3153, 935 F.2d 267 (table) at *6 (4th Cir. June 11, 1991); Brown v. Comm'r of Soc. Sec., No. 2:09-cv-243, 2010 WL 2787898, at *5 (E.D. Va. June 21, 2010); Nazelrod v. Astrue, No. BPG-09-0636, 2010 WL 3038093, at *5 (D. Md. Aug. 2, 2010). However, these cases, respectively, address situations where the form: was filled by a non-treating physician, was directly

---

[14] 8 out of 10 and 6 out of 10, respectively.
[15] There were also "fill-in-the-blank" portions and the doctors made annotations outside of these constraints. R. 462–76, 509–15.

contradicted by other opinion evidence, was a form for a disabled parking permit, and was given little weight after a detailed review of contradictory medical evidence including medical reports from 17 other physicians. Mason, 994 at 1065; Frazier, 935 F.2d 267 at *4; Brown, 2010 WL 2787898 at *5; Nazelrod, 2010 WL 3038093, at *5. Here, in contrast, the three forms were completed by treating physicians, whose treatment notes and medical records regarding Forehand are in the record. The forms are consistent regarding absences, vary slightly with regard to breaks, and, as discussed above, were not adequately considered by the ALJ and are not inconsistent with the portions of the record the ALJ relied upon to reject them. Additionally, the ALJ did not cite the conclusory checkbox nature of the forms as a reason for reducing the weight he gave the opinions. But, even if he had, such consideration would not have justified his summary dismissal of the opinions.

In summary, because the ALJ failed to properly consider the opinions of Forehand's treating physicians and Forehand's testimony, the RFC determination was flawed. This determination affected the VE's testimony as the hypothetical posed to the VE presumed a flawed RFC. R&R at 28–30. Accordingly, the conclusion that Forehand could adjust to other work in the economy and, therefore, was not disabled is also flawed. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

## IV. CONCLUSION

This Court has carefully and independently reviewed the relevant record in this case and the objections to the Report. For the reasons discussed above, the Court concludes that the ALJ's RFC assessment was flawed because the ALJ failed to consider, or disregarded, medical opinions of treating physicians with little, nonexistent, or logically disconnected reasons and applied an incorrect standard to weigh Forehand's testimony. Accordingly, the Court **FINDS** that

there is no meritorious reason to sustain Defendant's objections. The Court therefore **OVERRULES** Defendant's objections, Doc. 24, and **ADOPTS** the Magistrate Judge's Report and Recommendation, Doc. 21. The Court **DENIES** Defendant's Motion for Summary Judgment, Doc. 18, **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary Judgment, Doc 14, and **AFFIRMS** the Recommendation of the Magistrate Judge that the action be **REMANDED** for additional fact finding consistent with this Order and the Magistrate Judge's Report.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
Date: September 7, 2012